**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**COLUMBIA DIVISION**

| | | |
|---|---|---|
| Christopher Lytes, | ) | C/A No. 3:12-01672-MBS |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER AND OPINION** |
| | ) | |
| Christian Smith, David Wood, | ) | |
| Brian N. Smith and John Lookabill, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

Plaintiff Christopher Lytes ("Plaintiff") brings this action pursuant to 42 U.S.C § 1983 ("Section 1983" or "§ 1983") against Christian Smith ("Defendant C. Smith"), David Wood ("Defendant Wood"), Brian N. Smith ("Defendant B. Smith"), and John Lookabill ("Defendant Lookabill") (collectively "Defendants"), alleging violations of his Fourth, Fifth, Eighth, and Fourteenth Amendment rights. ECF No. 1 at 1 ¶ 1. Plaintiff seeks actual and punitive damages, including the costs of this action and attorney's fees. Id. at 4.

## I. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff was a communications equipment installer for Alcatel-Lucent ("ALU"), a company that maintains and installs telecommunications equipment and cellular towers for telephone service providers. ECF No. 30-8 at 3-4. On the evening of July, 19, 2009, Plaintiff and his co-workers Anthony Bell ("Bell") and Bill Mullen ("Mullen") were scheduled to work at a Sprint cellular tower (the "cell tower") located at 124 Business Park Drive in Lexington, South Carolina (the "work site"). ECF No. 1 at 2 ¶ 5. The cell tower was allegedly located on Mid-Carolina Electric Cooperative's

("MCEC") property.[1]  Id. at 1 ¶ 6.  Plaintiff, Bell, and Mullen each drove separate vehicles to the work site.  ECF No. 36-6 at 2.  Mullen traveled in his Chevy pickup truck, Bell drove his Lexus sedan, and Plaintiff was in the company vehicle, a white van with two company logos on each side.  Id.; ECF No. 30-8 at 6.

Plaintiff and his co-workers arrived at the work site at approximately 11:00 PM.  ECF No. 30-9 at 1 ¶ 4. After they were unable to gain access to the cell tower because of a locked entrance gate (the "entrance gate"), Plaintiff and his co-workers decided to search for an alternate access to the cell tower.  ECF No. 30-7 at 3; ECF No. 1 at 2 ¶ 6.  They returned to their vehicles, traveled down Long Pond Road, and turned onto a service road that was located between a wooded area and a perimeter fence surrounding MCEC's property (the "perimeter fence").  ECF No. 30-8 at 8-10; ECF No. 1 at 2 ¶ 6.  During their search for access to the cell tower, Plaintiff and his co-workers parked and exited their vehicles and began walking along the perimeter fence, which is adjacent to Interstate 20 ("I-20").  ECF No. 30-8 at 8; ECF No. 30-9 at 3 ¶ 12.  As Plaintiff and his co-workers walked along the perimeter fence, they spoke with a Sprint technician who told them to return to the entrance gate where they would be given security information to gain entry.  Id. at 10.  Plaintiff and his co-workers returned to their vehicles and traveled back down the service road towards Long Pond Road.  ECF No. 30-1 at 3.

Peggie Hanson ("Hanson"), a Systems Operator who provided security support for MCEC on the night of July 19, 2009, saw Plaintiff and his co-workers walking along the perimeter fence as she observed live video footage from security cameras located on MCEC property.  ECF No. 30-9

---

[1]

Defendants contend that the cell tower was not on MCEC property, but rather behind MCEC's property.  ECF No. 30-1 at 16, n.17.

at 1. Hanson did not recognize Plaintiff and his co-workers as MCEC employees. Id. at 2. As she

continued watching the video footage, Hanson allegedly observed "one of the men grab[] the fence

and pull on it." Id. Concerned that Plaintiff and his co-workers were attempting to break into

MCEC, Hanson called 911 to report a burglary in progress. Id. As a result, Lexington County

dispatch issued a toned alert to the Lexington County Sheriff's Department ("LCSD"), indicating

that a burglary was in progress at MCEC. ECF No. 30-2 at 3. Defendants immediately responded

to the burglary alert. ECF No. 30-4 at 4; ECF No. 30-6 at 3-4. Defendant B. Smith, Defendant

Lookabill, and Defendant Wood, all sheriff's deputies[2] with LCSD, were the first to arrive on scene.

ECF No. 30-6 at 4. When the officers arrived at MCEC, Defendant B. Smith instructed Defendant

Wood to check the right side of the building. ECF No. 30-6 at 4. Defendants B. Smith and

Lookabill, both carrying shotguns, proceeded on foot to the left side of the MCEC perimeter fence.

ECF No. 30-6 at 4.

      As Plaintiff and his co-workers traveled down the service road towards Long Pond Road,

they were confronted by Defendants B. Smith and Lookabill. ECF No. 30-8 at 11. With their

firearms drawn, Defendants B. Smith and Lookabill ordered Plaintiff and his co-workers to stop

driving and exit their vehicles. ECF No. 30-6 at 5. Plaintiff and his co-workers complied. Id.

Defendants B. Smith and Lookabill then instructed Plaintiff and his co-workers to lay in a prone

position on the ground in an area away from the vehicles. Id.; ECF No. 30-5 at 4. During the course

of their interaction with Defendants B. Smith and Lookabill, Plaintiff and his co-workers tried to

explain that they were there to work on a cell tower and asked the officers to check their employee

---

[2] Although Defendants are technically sheriff's deputies, both parties refer to them as "officers." To avoid confusion, the court will use this same terminology.

identification cards ("ID card(s)"),[3] but Defendants B. Smith and Lookabill "wouldn't listen . . . ." ECF No. 36-3 at 6; ECF No. 36 at 2.  Defendants B. Smith and Lookabill held Plaintiff and his co-workers at gunpoint until Defendant C. Smith, a Sergeant with LCSD, arrived shortly thereafter. ECF No. 36-3 at 4.  At some point,[4] Defendant Wood made his way from the right side of the building over to the left side of the perimeter fence to join the other officers.  ECF No. 36-3 at 4.

When Defendant C. Smith arrived, he placed Plaintiff and his co-workers in handcuffs and did a brief search of their reaching area.[5]  ECF No. 36-2 at 2.  After the search, Defendant C. Smith spoke with the officers and questioned Plaintiff and his co-workers about the situation.  ECF No. 30-2 at 7.  Plaintiff and his co-workers explained that they were employees of ALU, trying to find an

---

3

Deposition testimony indicates that Plaintiff's co-workers' ID cards were located in their vehicles.  However, Lytes appears to testify that his ID card was in his wallet.  See ECF No. 30-8 at 13 (Lytes Dep. 36:8-36:14, Mar. 21, 2013).  Also, because their employer did not require uniforms, Plaintiff and his co-workers wore regular clothing.  Id. at 7 (Lytes Dep. 22:9-22:19).

4

The record is unclear as to the circumstances of Defendant Wood's arrival.  Defendant C. Smith's testimony indicates that Defendant Wood was not on scene when he arrived.  Specifically, Defendant C. Smith testified that when he arrived, "there were two officers already on scene."  ECF No. 30-2 at 4 (Smith Dep. 9:23-9:24, Mar. 21, 2013).  In addition, Plaintiff testified as follows:

> Q:     How many officers were there?
> A:     I seen four officers.
> Q:     [W]henever you saw one officer, you saw four?
> A:     When I first seen them, I only seen – I seen two officers.  I seen two.
> Q:     Both had their weapons drawn?
> A:     Yes.
> Q:     Okay . . . . when did the other officers come into play?
> A:     I don't know, because there was . . . a lot of commotion.  Shortly after, you know we . . . got out of our vehicles, then I noticed that there was, you know, two more officers had showed up.

ECF No. 30-8 at 13-14 (Lytes Dep. 36:21-37-10).

5

During his deposition, Plaintiff testified that he was carrying a work knife and a pair of work scissors, which was removed from his pocket during the search.  ECF No. 30-8 at 20.

4

entrance to the cell tower.  Id.  Defendant C. Smith made several phone calls and eventually spoke with an ALU supervisor, who confirmed Plaintiff and his co-workers' explanation.  Id. at 10. Defendant C. Smith also walked over to Hanson's location, spoke with her directly, and viewed a portion of the video footage that prompted her to call the police.  Id. at 13.  Shortly thereafter, Plaintiff and his co-workers' were released.  Id. at 12.

On June 18, 2012, Plaintiff filed a complaint in this court alleging that (1) Defendants B. Smith, Wood, and Lookabill, who were under a duty to protect Plaintiff from wrongful arrest, failed to protect him from "being improperly handcuffed and arrested" by Defendant C. Smith (ECF No. 1 at 3 ¶ 10); (2) Plaintiff suffered an injury to his shoulder as a result of the arrest, which required surgery and has led to a permanent disability that prevents him from working at ALU; (3) Defendants' conduct amounted to cruel and unusual punishment, in violation of the Eighth Amendment of the United States Constitution; and (4) Plaintiff was denied due process of law and unlawfully seized, handcuffed, and detained, in violation of the Fourth, Fifth, and Fourteenth Amendments.  On August 24, 2012, Defendants filed a joint answer to the complaint.  ECF No. 6.

Defendants filed a motion for summary judgment on June 4, 2013, to which Plaintiff responded in opposition on July 22, 2013.  ECF Nos. 30, 36.  Defendants replied to Plaintiff's response on August 1, 2013.  ECF No. 38.

## II. LEGAL STANDARD AND ANALYSIS

### A. Standard

### 1. Summary Judgment

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

5

56(a).  A fact is "material" if proof of its existence or non-existence would affect the disposition of the case under the applicable law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986). A genuine question of material fact exists where, after reviewing the record as a whole, the court finds that a reasonable jury could return a verdict for the nonmoving party.  Newport News Holdings Corp. v. Virtual City Vision, Inc., 650 F.3d 423, 434 (4th Cir. 2011).

In ruling on a motion for summary judgment, a court must view the evidence in the light most favorable to the non-moving party. Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 123-24 (4th Cir. 1990).  The non-moving party may not oppose a motion for summary judgment with mere allegations or denials of the movant's pleading, but instead must "properly support . . . assertion[s] of fact" demonstrating a genuine issue for trial.  Fed. R. Civ. P. 56(e); see Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Shealy v. Winston, 929 F.2d 1009, 1012 (4th Cir. 1991).  All that is required is that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." Anderson, 477 U.S. at 249.  "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion."  Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 62 (4th Cir. 1995).  A party cannot create a genuine issue of material fact solely with conclusions in his or her own affidavit or deposition that are not based on personal knowledge. See Latif v. Cmty. Coll. of Baltimore, No. 08-2023, 2009 WL 4643890, at *2 (4th Cir. Dec. 9, 2009).

### 2.  Claims pursuant to 42 U.S.C. § 1983

Section 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'"    Albright v. Oliver, 510 U.S. 266, 271

(1994) (quoting <u>Baker v. McCollan</u>, 443 U.S. 137, 144 n.3 (1979)).  Section 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

To establish a cause of action under Section 1983, a plaintiff must allege: 1) the violation of a right protected by the Constitution or laws of the United States, and 2) that the defendant was acting under color of law.  <u>Parratt v. Taylor</u>, 451 U.S. 527, 535 (1981).

### a.  Fourth Amendment

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. It is well established that the Fourth Amendment "'protects people, not places . . . .'" <u>Terry v. Ohio</u>, 392 U.S. 1, 9 (1968) (quoting <u>Katz v. United States</u>, 389 U.S. 347, 351 (1967)).  "[W]herever an individual may harbor a reasonable expectation of privacy, he is entitled to be free from unreasonable government intrusion."  <u>Id.</u>

"[A]n officer may . . . conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." <u>Illinois v. Wardlaw</u>, 528 U.S. 119, 123 (2000) (citing <u>Terry</u>, 392 U.S. at 30)).  While the reasonable suspicion standard requires less justification than probable cause, the officer must still "articulate more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity." <u>Id.</u> (citing <u>Terry</u>, 392 U.S. at 30) (internal quotation marks

omitted)).  In determining whether reasonable suspicion exists, courts may credit "the practical experience of officers who observe on a daily basis what transpires on the street."  United States v. Lender, 985 F.2d 151, 154 (4th Cir. 1993).  In addition, courts must look at the totality of the circumstances and consider the "cumulative information available to the officer . . . ." United States v. Branch, 537 F.3d 328, 337 (4th Cir. 2008).  The courts evaluation must be objective and "if sufficient objective evidence exists to demonstrate reasonable suspicion, a Terry stop is justified regardless of a police officer's subjective intent." Id.

An officer must have probable cause to effect a warrantless arrest.  United States v. Johnson, 599 F.3d 339, 346 (4th Cir. 2010) (citing United States v. Watson, 423 U.S. 411, 417-24 (1976); Brinegar v. United States, 338 U.S. 160, 175-76 (1949)).  Probable cause, an objective standard, exists "when, at the time the arrest occurs, the facts and circumstances within the officer's knowledge would warrant the belief of a prudent person that the arrestee had committed or was committing an offense."  United States v. Manbeck, 744 F.2d 360, 376 (4th Cir. 1984).

### b.  Eighth Amendment: Cruel and Unusual Punishment

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments . . . ." U.S. Const. amend. VIII.  "Eighth Amendment scrutiny is appropriate only after the state has complied with the constitutional guarantees traditionally associated with criminal prosecutions." Ingraham v. Wright, 430 U.S. 651, 671-72 n.40 (1977).   In other words, Eighth Amendment protections attach only "after conviction and sentence."  Graham v. Connor, 490 U.S. 386, 392 n.6 (1989).

### c.  Due Process: Fifth and Fourteenth Amendments

The Due Process Clause of the Fifth Amendment prohibits the United States "from depriving any person of life, liberty, or property without due process of law."  McNeil v. Butz, 480 F.2d 314, 318 (4th Cir. 1973) (internal quotation marks omitted); see also United States v. Hornsby, 666 F.3d 296, 310 (4th Cir. 2012) ("[D]ue [P]rocess protections against the federal government are found in the Fifth Amendment.").  The Fifth Amendment only applies to the actions of the federal government, not state or local officials. See United States v. Al-Hamdi, 356 F.3d 564, 573 n.11 (4th Cir. 2004) ("[A]ctions of the federal government are reviewed under the Fifth Amendment.").

Under the Fourteenth Amendment, no State may "deprive any person of life, liberty, or property without due process of law . . . ."  U.S. Const. amend. XIV.  There are three kinds of Fourteenth Amendment Due Process claims that may be brought under 42 U.S.C. § 1983.  Zinermon v. Burch, 494 U.S. 113, 125 (1990).  First, claims may be brought for the denial of those specific protections in the Bill of Rights that have been made applicable to the states.  Id.  Second, an individual may bring claims under the substantive component of the Due Process Clause "that bars certain arbitrary, wrongful government actions, 'regardless of the fairness of the procedures used to implement them.'"  Id.  (quoting Daniels v. Williams, 474 U.S. 327, 331 (1986)).  Finally, a claim may be brought for a violation of procedural due process, which prohibits the deprivation of life, liberty, or property without "fair procedure."  Id.

 According to the Supreme Court, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." Albright v. Oliver, 510 U.S. 266, 273 (1994) (finding that an arrest without

9

probable cause implicated Fourth Amendment right and not the more general substantive due process right under the Fourteenth Amendment).

### 3.  Qualified Immunity

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Qualified immunity balances the "need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009).  "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Id. (internal quotation marks and citations omitted).

The Supreme Court has established a two-step analysis for qualified immunity claims.  See Saucier v. Katz, 533 U.S. 194, 201 (2001).  First, the court must determine "'whether the plaintiff has alleged the deprivation of an actual constitutional right at all and, if so, proceed to determine whether that right was clearly established at the time of the alleged violation.'"  Wilson v. Layne, 526 U.S. 603, 609 (1999) (quoting Conn v. Gabbert, 526 U.S. 286, 290 (1991)); see also Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000).  If the court determines that no right has been violated, there is no need for further inquiry "because government officials cannot have known of a right that does not exist." Porterfield v. Lott, 156 F.3d 563, 567 (4th Cir. 1998).

10

**B. Analysis**

**1. Fourth Amendment**

Defendants first assert that Plaintiff cannot show Defendants violated his Fourth Amendment rights. ECF No. 30-1 at 8. Defendants contend that despite Plaintiff's allegations, he was never arrested, but rather placed in investigatory detention, which must be supported by reasonable articulable suspicion. Id. Defendants assert that courts determine whether reasonable suspicion exists under an objective standard that considers the facts "*as known to the officers*." ECF No. 30-1 at 9. Defendants assert that they possessed "more than sufficient knowledge" to establish reasonable suspicion to detain Plaintiff. ECF No. 30-1 at 10.

In support of their argument that there was reasonable suspicion, Defendants first argue that the information they observed when they arrived at the scene was consistent with the description they received from the Lexington County dispatch. Id. at 10. More specifically, the officers observed three individuals traveling in three separate vehicles along the I-20 side of the perimeter fence. Id. In addition, Defendants contend that theft was a known issue at MCEC's property. Id. Defendants argue that Defendants B. Smith and Lookabill, using their "common sense judgment" and "practical experience," detained Plaintiff to determine whether a burglary was in progress. Id. Based upon the totality of the circumstances, Defendants assert there was reasonable suspicion to hold Plaintiff in investigative detention. Id.

Defendants next argue that once reasonable suspicion was established, they acted properly in handcuffing Plaintiff to conduct an investigation. Id. at 11. In this regard, Defendants first note that while Plaintiff alleges he was handcuffed without probable cause, the proper standard to justify investigative detention is reasonable suspicion. Id. Defendants contend that the Fourth Circuit has

11

held that an officer may handcuff a suspect to protect officer safety during an investigative stop.  Id.

Defendants further argue that handcuffing an individual, by itself, does not turn a permissible Terry

stop into an arrest.  Id.  Defendants contend that it was appropriate to place Plaintiff and his co-

workers in handcuffs because of (1) the time of night; (2) the wooded area allowing for potential

escape; and (3) the lack of cover for the officers.  Id. at 13.  Defendants assert that given the

circumstances in this case, the "mere act of handcuffing" Plaintiff did not amount to a violation of

his constitutional rights.  Id.

      As noted earlier, Defendants assert that Plaintiff was placed under investigative detention,

rather than arrest.  Id.  Defendants contend that while Plaintiff was not free to leave, the Fourth

Circuit has rejected the free to leave analysis for determining whether an investigative detention has

turned into an arrest.  Id.  Defendants also argue that courts consider the reasonableness of an

investigative detention on a "case by case basis," and take into account the diligence of the police

investigation.  Id. at 14 (citing United States v. Vaughan, 700 F. 3d 705, 709 (4th Cir. 2012); United

States v. Place, 462 U.S. 696, 709 (1983)).  In addition, Defendants contend that the detention was

reasonable because the duration of Plaintiff's detention, 30 to 40 minutes, was not excessive under

Fourth Circuit precedent and did not, on its own, transform the investigative detention into an arrest.

Id. at 15; see United States v. McFarley, 991 F.2d 1188, 1193 (4th Cir. 1993) (finding that 38 minute

detention did not transform Terry stop into an arrest).

      Defendants next assert that even if Plaintiff's detention was an arrest, there was probable

cause to arrest Plaintiff and his co-workers for criminal trespass under South Carolina law.  Id. at 15.

Defendants assert that there were multiple "no trespassing" signs along the perimeter fence, and that

Hanson did not believe Plaintiff and his co-workers had permission to be on the property.  Id.

Defendants state that probable cause "may be based on uncharged conduct." Id. at 16. Moreover, as Defendants contend, when determining the existence of probable cause, an officer's subjective reason for an arrest is irrelevant, and courts must instead consider the facts as known to the officer to determine if "objective probable cause" was sufficient for any crime. Id.

In his response in opposition, Plaintiff first argues that the circumstances of this case constitute a formal arrest because he (1) was not free to leave; (2) had a gun pointed at him; (3) was frisked; (4) and was handcuffed and forced to lay face down on the ground. ECF No. 36 at 3. Plaintiff argues that the Tenth Circuit has held that the use of firearms and handcuffs "'generally exceed the scope of an investigative detention and enter the realm of an arrest.'" Id. (quoting Cortez v. McCauley, F. 3d 1108, 1117 (10th Cir. 2007)). Also in support of this position, Plaintiff contends that in Park v. Shiflett, 250 F.3d 843, 852 (4th Cir. 2001), the Fourth Circuit held that the officers' use of handcuffs and forcible detention against a husband and wife constituted an arrest.[6] Plaintiff argues that Defendants should have immediately verified Plaintiff and his co-workers' explanations by looking at the company van and requesting Plaintiff's identification. Id. at 5.

Plaintiff further asserts that the officers who arrived on scene before Defendant C. Smith did not inform Defendant C. Smith of the explanation they had received from Plaintiff and his co-workers. Id. at 6. Plaintiff argues that it was clear he and his co-workers posed no danger and had committed no crime because (1) they had explained that they were working on the cell tower; (1) the

---

[6] In Park, a husband and wife called the police to report that they had accidentally set off an alarm at an unattended convenience store. Park, 250 F.3d at 848. After police officers arrived and confirmed the absence of forced entry and that nothing had been stolen, the couple realized that they left the stove on at home. Id. When the husband attempted to leave against police orders, an officer threw him against the wall, kicked his legs apart, handcuffed and locked him into a patrol car. Id. at 851. The court found that under these facts, the husband was "not simply detained but was arrested." Id.

officers found no weapons, except for a work knife; (2) there was no evidence of entry into the MCEC fence; (3) and the work van bore two company logos. Id. Also, in addressing Defendants' contention that merely handcuffing Plaintiff did not violate his constitutional rights, Plaintiff asserts that this conclusion does not view the facts in the light most favorable to Plaintiff and "ignores the fact that the officers ignored" his explanation that he was working on a cell tower and had identification. Id.

Finally, with regard to Defendants' argument that there was probable cause to arrest Plaintiff for criminal trespass, Plaintiff contends that under S.C. Code Ann. § 16-11-620, if an individual has a "good excuse," he or she can enter upon another's property. Id. Plaintiff asserts that his attempt to find an entrance to the cell tower was a "good excuse." Id. at 7.

### 2. Fifth, Eighth, and Fourteenth Amendments

Defendants contend that Plaintiff's claims under the Fifth, Eighth, and Fourteenth Amendments are inapplicable in this case. ECF No. 30-1 at 17. First, with regard to Plaintiff's Fifth Amendment claim, Defendant argues that Plaintiff has failed to provide any evidence or factual allegations to support a due process violation. Id. Next, as to Plaintiff's Eighth Amendment claim, Defendants contend that there is no evidence of cruel and unusual punishment. Id. Finally, Defendants contend that the Fourteenth Amendment is inapplicable because the Fourth Amendment provides the "explicit textual source" of constitutional protection against false arrests. Id. at 18. Based on these reasons, Defendants assert that they are entitled to summary judgment with regard to Plaintiff's Fifth, Eighth, and Fourteenth Amendment claims.

Plaintiff does not respond to Defendants' arguments regarding the Fifth, Eighth, and Fourteenth Amendments.

14

### 3. Bystander Liability

Defendants next address Plaintiff's claim that Defendants B. Smith, Wood, and Lookabill failed to protect him from being improperly handcuffed and arrested by Defendant C. Smith.  Id. Defendants presume that Plaintiff is asserting a theory of bystander liability under § 1983.  Id. Defendants then argue that an officer may be liable under § 1983 if he or she knows that an officer is violating an individual's constitutional rights, has a reasonable opportunity to prevent the harm, but fails to do so.  Id. at 19. (quoting Randall v. Prince George's County, 302 F. 3d 188, 203 (4th Cir. 2002)).  Defendants assert that Plaintiff cannot satisfy bystander liability because there was no violation of Plaintiff's constitutional rights and no harm to prevent.  Id.

Plaintiff addresses Defendants' response to his failure to protect claim.  ECF No. 36 at 7. Plaintiff contends that while Defendants accurately state the law concerning bystander liability, they ignore the facts "giving rise to such liability." Id.  Plaintiff argues that Defendants B. Smith and Lookabill[7] knew that Plaintiff and his co-workers were trying to locate the cell tower, but failed to disclose this information to Defendant C. Smith, permitting him to place them in handcuffs.  Id. Plaintiff states that based on these facts, there is a jury question concerning whether Defendants B. Smith and Lookabill's silence constitute a failure to protect Plaintiff.  Id.

---

[7] In his complaint, Plaintiff asserts that he was confronted and held at gun point by Defendants B. Smith, Lookabill, and Wood.  Plaintiff further alleged that Defendants B. Smith, Lookabill, and Wood failed to protect him from being improperly handcuffed.  However, in his response in opposition, Plaintiff maintains that Defendants B. Smith and Lookabill failed to protect him, but fails to assert this allegation against Defendant Wood.

### 4.  Qualified Immunity

Defendants next assert that they are entitled to qualified immunity[8] because even assuming the court finds a violation of Plaintiff's constitutional rights, their conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person should have known." ECF No. 30-1 at 20. (quoting Harlow v. Fitzgerald, 457 U.S. 800 (1982)).  To support this argument, Defendants reiterate that they acted reasonably in the context of this case.  Id. at 20-25.

Plaintiff seems to argue that Defendants did not act reasonably and are not entitled to qualified immunity. ECF No. 36 at 8.  Plaintiff asserts that Defendants should have investigated the situation before forcibly detaining Plaintiff.  Id.  Plaintiff further asserts that an escalation of an investigative detention with "handcuffs and a show of force" is only appropriate under the most extreme circumstances.  Id. (citing Park, 250 F. 3d at 850).  Plaintiff contends that under the facts of this case, a jury could find that Defendants were unreasonable in placing Plaintiff in handcuffs. Id. at 9.

### 5.  The Court's Review

The court first considers Plaintiff's Fifth, Eighth, and Fourteenth Amendment claims.  As noted above, the Due Process Clause of the Fifth Amendment applies to the federal government, not state or local officials.  Thus, the Fifth Amendment is inapplicable to this case, which involves local officers.  Additionally, the facts of this case do not support an Eighth Amendment violation. Specifically, there was no criminal conviction for which Plaintiff could have been punished.  Thus, the Eighth Amendment does not apply in this case. Finally, Plaintiff's Fourteenth Amendment claim

---

[8]     Defendants also assert that they are state officials, and therefore, entitled to immunity under the Eleventh Amendment.

16

is also in error.  As noted above, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." Albright, 510 U.S. at 273.  Because Plaintiff asserts wrongful arrest, the Fourth Amendment, not the Fourteenth Amendment, is the relevant constitutional provision.  For the reasons stated above, Plaintiff's Fifth, Eighth, and Fourteenth Amendment claims have no merit.

The court next turns to Plaintiff's claims under the Fourth Amendment.  Specifically, the court considers whether Plaintiff was placed under arrest or held in investigative detention (i.e., Terry stop), an issue central to the resolution of this case.  According to the Fourth Circuit, "'[a] Terry or investigative stop can cross the line and turn into an arrest . . . [if], under the totality of the circumstances, the suspect's freedom of action is curtailed to a degree associated with formal arrest.'"  Young v. Prince George's County, Maryland, 355 F.3d 751, 755 (4th Cir. 2004) (quoting Park, 250 F.3d at 850) (internal quotations and citation omitted).  Although Plaintiff asserts that Defendants' use of handcuffs and firearms and forcing him to lie on the ground amounts to an arrest, the Fourth Circuit has consistently reached a different conclusion.  The Fourth Circuit has held that "drawing weapons, handcuffing a suspect, placing a suspect in a patrol car for questioning, or using or threatening to use force does not necessarily elevate a lawful stop into a custodial arrest . . . ." United States v. Leshuk, 65 F.3d 1105, 1109-10 (4th Cir. 1995); see also United States v. Elston, 479 F.3d 314, 320 (2007) ("These officers reasonably suspected that [defendant] was armed and dangerous, and thus did not exceed the limits of a Terry stop by drawing their weapons and placing [him] in handcuffs.").

17

Plaintiff also suggests that he was under arrest because he was not free to leave. However, it is well settled that "the perception that one is not free to leave is insufficient to convert a Terry stop into an arrest." United States v. Moore, 817 F.2d 1105, 1108 (4th Cir. 1987). Indeed, "Terry stops customarily involve 'detentions where the person detained is not technically free to leave . . . .'" Leshuk, 65 F.3d at 1109 (quoting United States v. Manbeck, 744 F.2d 360, 376-77 (4th Cir. 1984)). "Terry stops differ from custodial interrogation in that they must last no longer than necessary to verify or dispel the officer's suspicion, not because of the absence of any restriction of liberty." Elston, 479 F.3d at 320.

Based on the totality of the circumstances in this case, the court finds that the officers held Plaintiff in investigative detention. In responding to an eyewitness report of an alleged burglary in an area known for such criminal activity,[9] it was reasonable for the officers to suspect that Plaintiff and his co-workers were armed and dangerous. Moreover, Defendants B. Smith and Lookabill were outnumbered[10] and on foot as Plaintiff and his co-workers approached in three separate vehicles.

---

[9]

Defendant C. Smith provided the following testimony about the criminal activity in the area:

| | |
|---|---|
| A: | This is about 11:00 at night. And that area had been recently targeted a lot by our copper wire metal thieves. So the entire shift . . . most of the shift responded to the call. |
| Q: | So you're saying the area had been targeted recently for copper wire thefts? |
| A: | Uh-huh. |

ECF No. 30-2 at 3-4 (C. Smith Dep. 8:25-9:7). Further, Defendant B. Smith testified as follows:

| | |
|---|---|
| A: | We're being told that there's three subjects[.] |
| Q: | [That] possibly broke into the Mid-Carolina. Knowing . . . there's a bunch of theft in the area, we hop out. Its dark, no cover. We grab our shotguns because we're on foot. |

ECF No. 30-6 at 4 (B. Smith Dep. 10:3-10:9, Mar. 22, 2013).

[10]

As the court noted previously, the record is unclear as to when Defendant Wood arrived on scene with Plaintiff and his co-workers. Defendant C. Smith testified that two officers were on scene when he arrived. However,

The wooded area and I-20 provided a convenient escape route, it was late at night, and Defendants B. Smith and Lookabill had no cover from an ambush. Because of the uncertainty of this situation, Defendants B. Smith and Lookabill held Plaintiff and his co-workers at gunpoint in order to secure the scene and to provide safety for themselves until the other officers arrived. See Young, 355 F.3d at 755 ("'The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.'") (quoting Graham v. Connor, 490 U.S. 386, 386–87 (1989)). Once Defendant C. Smith arrived, he placed Plaintiff and his co-workers in handcuffs and conducted an investigation, which lasted approximately 30-40 minutes.[11] The use of handcuffs in this instance was "'reasonably necessary to maintain the status

---

Mullen, apparently referring to Defendant C. Smith, testified that "a fourth officer show[ed] up in a marked police car with his lights on . . . . and he's the one that handcuffed us." ECF No. 30-7 at 4 (Mullen Dep. 18:8-18:13, Mar. 22, 2013). Also, Plaintiff testified that he first saw two officers with their weapons drawn, but was unsure when the other officers arrived. Furthermore, while Plaintiff alleged in his complaint that he was confronted and held at gun point by three officers, Plaintiff in his response in opposition contradicts his initial allegations and only asserts that Defendants B. Smith and Lookabill failed to protect him from being handcuffed by Defendant C. Smith. Plaintiff provides no explanation for the change in his arguments. Viewing this issue in Plaintiff's favor, the court's conclusion remains unchanged. The totality of the circumstances indicates that the officers acted reasonably and that Plaintiff was subject to no more than a Terry stop.

[11]

On this point, Plaintiff testified as follows:

> Q:    Okay. What happened after you were handcuffed and you were laying down?
> A:    We laid there for, I guess maybe 30/40 minutes waiting for, I guess, the lieutenant that was in charge to come back to verify our information and our identity.

ECF No. 30-8 at 16 (Lytes Dep. 39:2-39:7). Further, the court finds that the duration of Plaintiff's detention did not exceed the limits of a Terry stop. The Supreme Court has stated the following with regard to the duration of Terry stops:

> In assessing whether a detention is too long in duration to be justified as an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the [suspect].

quo and protect [officer] safety during an investigative stop.'" <u>United States v. Crittendon</u>, 883 F.2d 326, 329 (4th Cir. 1989) (quoting <u>United States v. Taylor</u>, 857 F.2d 210, 213 (4th Cir. 1988)). Thereafter, Defendant C. Smith verified that Plaintiff and his co-workers were there to work on the cell tower and let them go.  <u>See</u> <u>Florida v. Royer</u>, 460 U.S. 491, 500 (1983) ("[A]n investigatory detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop.").  The events of this case constitutes an investigative detention, and at no point did it evolve into an arrest.

Because Plaintiff was held in investigative detention and not placed under arrest, reasonable suspicion is the applicable standard in this case.  The circumstances described above make clear that the officers had reasonable suspicion that a burglary was in progress, justifying the investigative detention of Plaintiff.  Plaintiff's Fourth Amendment claim is without merit.[12]

The court will now address Plaintiff's failure to protect claim.  Both parties agree that this claim is analyzed under a theory of bystander liability.  To make out a § 1983 claim of bystander liability against an officer, Plaintiff must show that the officer "(1) knows that a fellow officer is violating an individual's constitutional right; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act."  <u>Randall v. Prince George's County, Md.</u>, 302 F.3d 188, 204 (4th Cir.

---

<u>United States v. Sharpe</u>, 470 U.S. 675, 686 (1985).  As noted above, during his investigation, Defendant C. Smith spoke with Plaintiff and his co-workers; talked with an ALU supervisor to verify Plaintiff's explanation as to his work orders; walked over to the MCEC security station and spoke with Hanson directly; and viewed a portion of the security video footage.  Under the circumstances of this case, Defendant C. Smith's investigation was reasonable and diligent.

[12]

Having determined that Plaintiff's Fourth, Fifth, Eighth, and Fourteenth Amendment claims are without merit, the court need not address Defendants' arguments with regard to probable cause and Eleventh Amendment immunity.

2002).  As explained above, there was no constitutional violation in this case.  Plaintiff's bystander liability claim must fail.

Furthermore, because Plaintiff has failed to establish a violation of his constitutional rights, the court need not address whether Plaintiff's asserted rights were "clearly established" for purposes of qualified immunity.  See DiMeglio v. Haines, 45 F.3d 790, 799 (4th Cir. 1995) ("In many cases where a defendant has asserted qualified immunity, dismissal or even an award of summary judgment may be obviously warranted, based upon existing law, without the court ever ruling on the qualified immunity question.").  Therefore, the court grants Defendants' motion for summary judgment as to their affirmative defense of qualified immunity.

### III.  CONCLUSION

For the reasons stated above, the court **GRANTS** Defendants' motion for summary judgment (ECF No. 30).

**IT IS SO ORDERED.**


 s/ Margaret B. Seymour_____
Margaret B. Seymour
Senior United States District Judge

Columbia, South Carolina
March 28, 2014

21